IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| CARL MAYBIN,<br><br>    Plaintiff,<br><br> vs.<br><br>HILTON GRAND VACATIONS<br>COMPANY, LLC,<br><br>    Defendant. | CIVIL NO. 17-00489 DKW-KSC<br><br>**ORDER DENYING DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT** |

## <u>INTRODUCTION</u>

   Hilton Grand Vacations Company, LLC ("Hilton") seeks summary judgment on Plaintiff Carl Maybin's claim that he was unlawfully terminated from his timeshare sales position due to his age in violation of the Age Discrimination in Employment Act ("ADEA"), U.S.C. § 621 *et seq.* After Maybin failed to meet sales quotas for several consecutive months and was subject to progressive written warnings, Hilton terminated him. Maybin, however, contends that age-based discrimination by his supervisors hindered his ability to complete sales and adequately perform his job. Because there are genuine issues of material fact with regard to the veracity of Hilton's performance-based explanations, which Hilton did not fully address, the Motion for Summary Judgment as to Count I is DENIED.

# BACKGROUND

## I.  Factual Background

Maybin was hired by Hilton as a sales agent in September 2015 when he was 55 years old.   Before his hiring, Maybin had a series of job interviews.   He first interviewed with Derek Kanoa, Vice President of Sales, and then with Julia Montenegro, a senior member of Hilton's Human Resources department.   Decl. of Carl Maybin ¶ 3, Dkt. No. 26-1.   Maybin followed that by interviewing with Dave Colton, and last with Joshua Kannel, the Hawaii Director of Sales.   Maybin Decl. ¶¶ 3–4.   Based upon Kannel's recommendation and request, Maybin was hired on September 14, 2015.   Decl. of Joshua Kannel ¶ 7, Dkt. No. 21-1.[1]

According to Maybin, shortly after he was hired, he witnessed Kannel display overt animus towards older sales agents by making negative comments about their abilities at sales meetings.   Maybin avers that Kannel "ridicule[d] [himself], Bob Bennett, Jose Henao, and Richard Green because of their ages[,]" each one of them "sales agents in [their] late 50s."   Maybin Decl. ¶ 6.   For example, Kannel said they "were too slow, can't learn, have a different way of doing things, are hard to teach new ways of sales, are too old to change, and don't have the energy necessary

---

[1]Decisions regarding the hiring and firing of sales agents are centralized and restricted to personnel working in Hilton's Human Resources department for the Hawaii market ("Hilton HR").   Kannel Decl. ¶¶ 7–8; Decl. of Julia Montenegro ¶ 15, Dkt. No. 29-1.   Only Julia Montenegro and John Boulanger had the authority to make hiring and firing decisions with respect to sales agents such as Maybin.   Montenegro Decl. ¶¶ 16–17.

for sales."  Maybin Decl. ¶ 6.  Kannel made such comments at sales meetings from the time that Maybin first started "and continued [making them] throughout [his] employment" with Hilton.  Maybin Decl. ¶ 6.

Although Hilton contends that Maybin was terminated because he was not performing his job adequately as measured by objective performance standards, Maybin asserts that from the inception of his employment until the beginning of February 2016, his sales were strong, and at times he "was number 2 or 3 in sales," compared to his peers.  Maybin Decl. ¶ 7.  From the end of February 2016, however, Maybin's sales numbers declined, and he attributes that decline, in part, to being "given less tours," and intentionally assigned fewer potential customers. Maybin Decl. ¶¶ 8–9.  Kannel was responsible for creating the daily "'roter' or list of sales people in the order that they would get tours."  Maybin Decl. ¶ 10.  Those employees listed near the top of the "roter" were assigned a greater number of tours, according to Maybin, "usually 2 or 3 per day, [however,] [i]f you were at the bottom of the list, you would get none, or 1 to 2 tours per day."  Maybin Decl. ¶ 11.  In Maybin's version of events, he was "intentionally given less tours, even though he was a high producer of sales.  Being given less tours resulted in less sales, [because] [i]f you don't get customers for tours, you get less sales."  Maybin Decl. ¶ 9.  From the end of February 2016, Maybin claims that he "was placed toward the bottom of

the 'roter', even though [his] sales performance had been good, and [he] was meeting quotas." Maybin Decl. ¶ 12.

In March 2016, Maybin was assigned a new sales manager, James Tony Wilson, who treated Maybin "in a very hostile manner" from their first interaction. Maybin Decl. ¶¶ 13–14. Wilson made inappropriate comments to Maybin, "interfer[ing] with [his] sales by making sarcastic remarks about [his] clients." Maybin Decl. ¶ 15. Maybin lost sales because Wilson "would refuse to meet with [his] customers after [Maybin] gave them a tour to talk to them about purchasing." Maybin Decl. ¶ 15. Because "[o]nly the sales managers [such as Wilson] could do the actual sales," this meant that Maybin lost sales "about ten times" because of Wilson's alleged conduct. Maybin Decl. ¶ 15. Maybin asked three times to be reassigned to another sales manager, but claims that his requests were "refused." Maybin Decl. ¶ 16.

Maybin received his first written job performance warning in May 2016 for failure to meet Hilton's job performance standards. Hilton assesses sales agents and executives' performance under its "Minimum Performance Standards" system ("MPS"), which operates in the following manner:

> Under the MPS, during the first three months of employment, Sales Executives were required to complete a total of five sales within that three month period.

4

Under the MPS, during the second three months of employment, Sales Executives were required to complete a total of seven sales within that second three month period.

Once a Sales Executive had passed the first six months of employment, their MPS requirements changed from being based on the number of sales made to a "Value Per Guest" ("VPG") basis.

Under the MPS, after six months of employment, Sales Executives were required to meet a monthly VPG minimum of $2,200 in at least one of the three following categories: (1) current month, (2) an average of the prior three month period, or (3) an average of the prior twelve month period.

Kannel Decl. ¶ 8(b)–(e) (citing Ex. 1).   The consequences of failure to meet minimum performance guidelines after the three-month introductory period are as follows:

Starting in the fourth month of a Sales Executive's employment[,] if a Sales Executive fails to meet the required MPS, they were subject to a system of progressive written warning documenting their lack of performance and failure to satisfy the MPS ("Job Performance Warning System").

Under the Job Performance Warning System[,] the progression is as follows: (1) written warning, (2) a second/final written warning, and (3) termination.

Kannel Decl. ¶ 12(a)–(b) (citing Ex. 1).

According to Hilton, during the final four months of his employment, Maybin did not meet any of the standards under the MPS.   That is, he failed to have a VPG of at least $2,200 on the basis of current sales or an average of the prior three months of sales.   During April, May, June, and July 2016, Maybin performed as follows:

| VPG Month | Plaintiff's Sales | Plaintiff's VPG Current Month | Plaintiff's VPG 3 Month Avg. |
|---|---|---|---|
| Month 7 (April 2016) | $1,202 | $943 | $943 |
| Month 8 (May 2016) | $1,247 | $1,809 | $1,291 |
| Month 9 (June 2016) | $1,161 | $401 | $952 |
| Month 10 (July 2016) | $0.00 | $0.00 | $648 |

Kannel Decl. ¶ 11.   When Maybin did not meet his required VPG in May 2016, he received his first written job performance warning on June 25, 2016.   Kannel Decl. ¶ 13; Ex. 2 (6/25/16 Performance Management Review Document), Dkt. No. 21-3. Maybin received a second and final written warning when he did not meet his VPG for June 2016.   Kannel Decl. ¶ 15; Ex. 3 (7/26/16 Performance Management Review Document), Dkt. No. 21-4.

Maybin acknowledges that during April, May, and June of 2016, he did not meet sales quotas, but says that he "was intentionally given less tours which kept [his] sales numbers down and [his] sales manager was refusing to meet [with his] customers."   Maybin Decl. ¶ 17.   Hilton maintains that Maybin always received at least 15 tours per month—even after February 2016—and that "[o]nly 15 tours are required each month for a sales executive to meet his sales quotas."   Decl. of Julia Montenegro ¶ 5, Dkt. No. 29-1.

According to Hilton HR's Montenegro, in May 2016, Maybin was not required to attend any training and had 19 tours. Montenegro Decl. ¶ 9. After he received his first written warning, he was "placed into remedial training for *June 2016*," and that month, his tours increased from 19 to 29. Montenegro Decl. ¶¶ 9–10. In July, Maybin received 23 tours and "was given an extra month of remedial training." Montenegro Decl. ¶ 13.

According to Maybin, in July 2016, he was ordered to attend mandatory training of undisclosed duration at the Pan Am Building on Kapiolani Boulevard. Maybin Decl. ¶ 18. As a result of the required training, Maybin claims to have only received one tour per day at 8:00 a.m., and had no sales in July 2016. According to Maybin, he "could not possibly have met quota because he was in mandatory training." Maybin Decl. ¶ 18.

When Maybin did not meet his VPG in July 2016, he was terminated the following month. Kannel Decl. ¶¶ 17–18; Ex. 4 (8/23/16 Performance Management Review Document), Dkt. No. 21-5; Ex. 5 (8/29/16 Personnel Authorization Form), Dkt. No. 21-6. Per Kannel, he recommended this course of action to Hilton HR solely due to Maybin's sales performance, and declares that "Maybin's age had no part in [his] decision to recommend Mr. Maybin's termination." Kannel Decl. ¶ 20. Montenegro likewise avers that "age had no part in [Hilton's] decision to terminate Mr. Maybin." Montenegro Decl. ¶ 22. Maybin

disagrees, contending that he was wrongfully terminated in August 2016 due to age discrimination.

## II.    Procedural Background

Maybin filed his Charge of Discrimination with the Equal Opportunity Employment Commission on January 4, 2017, Montenegro Decl. Ex. 1, Dkt. No. 32-1, which then issued a Notice of Right to Sue on June 30, 2017.   *See* Mem. in Opp'n at 3.   On September 27, 2017, Maybin filed his Complaint alleging three counts under the ADEA: (1) age discrimination; (2) hostile work environment; and (3) retaliation.   Compl. ¶¶ 18–28, Dkt. No. 1.   The Complaint alleges that on "August 1, 2016, Plaintiff was terminated from his position with Defendant Hilton due to discrimination based on his age (56), and in retaliation for complaining about the discrimination."   Compl. ¶ 4.   On November 21, 2017, the parties stipulated to the dismissal with prejudice of Maybin's Count III retaliation claim.   Dkt. No. 17.

Hilton now moves for summary judgment on Maybin's Count I ADEA age discrimination claim.[2]

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any

_____

[2] Although it initially moved on all remaining claims, at the February 9, 2018 hearing, Hilton withdrew without prejudice its Motion with respect to the Count II hostile work environment claim.   *See* Dkt. No. 33 (2/9/18 Court Minutes).

material fact and the movant is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). Once the moving party has satisfied its initial burden of production, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. *Id*. at 1103.

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). At least some "'significant probative evidence tending to support the complaint'" must be produced. *Id*. (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)); *see also Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."). "[I]f

the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). *Accord Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

## DISCUSSION

Hilton argues that Maybin was not adequately performing his job as a timeshare sales agent when he was terminated, and moreover, age was neither the "but for" cause of its decision to terminate him nor were its reasons pretext for discrimination. Although Maybin acknowledges that his monthly sales numbers fell below the minimum requirements during the relevant time period, he attributes the shortages to being "deliberately set[-up] for failure and termination." Mem. in Opp'n at 11. In its briefing, Hilton failed to address at least some of Maybin's explanations for his monthly sales deficiencies—his sales manager intentionally interfered with his ability to make sales, he was placed at the bottom of the "roter," and then required to attend mandatory training which likewise impacted his ability to make sales—all allegedly due to his supervisors' age-based animus. At this preliminary stage of the case, drawing all reasonable inferences in his favor, Maybin

raises triable issues of material fact as to whether Hilton's proffered reasons for his

termination were pretext for unlawful discrimination, precluding summary

judgment as to Count I.

## I.  Legal Framework for Age Discrimination Claims Under the ADEA

The federal ADEA prohibits discrimination based on age.   29 U.S.C.

§ 623(a)(1) ("It shall be unlawful for an employer to . . . discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's age").   The prohibition is "limited to

individuals who are at least 40 years of age."   29 U.S.C. § 631(a).

Motions for summary judgment regarding ADEA claims may be analyzed

using the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).   *Shelley v. Geren*, 666 F.3d at 608 (9th Cir. 2012) (holding that the

*McDonnell Douglas* burden-shifting framework applies to summary judgment

motions under the ADEA).   For the first step in the burden-shifting framework, a

plaintiff must present evidence of a prima facie case of discrimination by showing

that (1) he belongs to a protected class, (2) he was qualified for his position, (3) he

was subjected to an adverse employment action, and (4) similarly situated

individuals outside his protected class were treated more favorably.   *Davis v. Team

Elec. Co*., 520 F.3d 1080, 1089 (9th Cir. 2008).

If the plaintiff establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn v. Executive Jet Management, Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010). If the movant meets this burden, a plaintiff must raise "a triable issue of material fact" as to whether defendant's proffered reasons for the adverse employment actions are "mere pretext for unlawful discrimination." *Hawn*, 615 F.3d at 1155. "[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn*, 615 F.3d at 1158.

"A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Direct evidence is usually composed of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co*., 413 F.3d 1090, 1094–95 (9th Cir. 2005); *Earl v. Nielsen Media Research, Inc*., 658 F.3d 1108, 1113 (9th Cir. 2011) (holding that "comments from supervisors betraying bias or animus against older workers" constitute direct evidence of age discrimination). "Because direct evidence is so probative, the plaintiff need offer 'very little direct evidence to raise a genuine issue of material fact.'" *Id*. at 1095. In contrast, circumstantial evidence constitutes "evidence that

requires an additional inferential step to demonstrate discrimination." *Id*. at 1095. A plaintiff's circumstantial evidence must be both specific and substantial in order to survive summary judgment. *Becerril v. Pima Cty. Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009).

Alternatively, a member of a protected class suffering an adverse employment action may rely solely on "direct evidence," rather than the burden-shifting framework. "Direct evidence, in the context of an ADEA claim, is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the *fact finder* to infer that that attitude was more likely than not [the cause of] the employer's decision." *Enlow v. Salem–Keizer Yellow Cab Co., Inc*., 389 F.3d 802, 812 (9th Cir. 2004) (citation omitted) (emphasis in original). Direct evidence often takes the form of slurs made by the employer against members of the protected category. *See, e.g., Earl*, 658 F.3d at 1113 (noting that "comments from supervisors betraying bias or animus against older workers" constitute direct evidence of age discrimination); *Mustafa v. Clark Cty. Sch. Dist*., 157 F.3d 1169, 1180 (9th Cir. 1998) ("Discriminatory remarks are relevant evidence that, along with other evidence, can create a strong inference of intentional discrimination.").

Whichever theory plaintiffs proceed under, at trial "they retain [ ] the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse

action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).   In other words, a plaintiff must do more than "produce some evidence that age was one motivating factor in [an employment] decision." *Id*.   A plaintiff must show, at the summary judgment stage, that a reasonable trier of fact could conclude, by a preponderance of the evidence, that the plaintiff would not have been fired but for impermissible age discrimination. *See, e.g.*, *Scheitlin v. Freescale Semiconductor, Inc*., 465 Fed. Appx. 698, 699 (9th Cir. 2012) (applying *Gross*'s "but for" causation standard at the summary judgment stage).

The Ninth Circuit has held that "the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of California Davis Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).   "This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Id*. (citing *Schnidrig v. Columbia Mach., Inc*., 80 F.3d 1406, 1410 (9th Cir. 1996)) (internal quotation marks omitted).

In light of this framework, the Court turns to the merits of Maybin's Count I claim for age discrimination.

## II.    <u>Genuine Issues of Material Fact Defeat Summary Judgment</u>

With respect to Maybin's prima facie case, Hilton accepts for purposes of this Motion that Maybin was a member of a protected class and suffered an adverse

employment action.   Hilton argues that Maybin's ADEA claim fails as a matter of law because (1) he was an objectively poor employee based upon his sales performance; and (2) he fails to demonstrate that his age was the "but-for" cause of Hilton's decision to terminate him or that its reasons were pretext for discrimination. Reply at 1, Dkt. No. 29.

### A.    Genuine Issues Remain With Respect to Pretext

Maybin concedes that he did not meet his sales quotas and monthly VPG in April, May, and June of 2016, but argues that he was intentionally hindered from adequately performing his job due to conduct by his supervisors, who openly exhibited age-based animus against him and other older sales agents.   Although Hilton asserts that Maybin "cannot blame Defendant for his own performance deficiencies," Reply at 2, this rebuttal misses the mark.   That is because Maybin accuses Hilton of deliberately preventing him from meeting his sales quotas, in part, based on unrebutted testimony that he "was intentionally given less tours which kept [his] sales numbers down and [his] own sales manager was refusing to meet [Maybin's] customers to close sales."   Maybin Decl.¶ 17.   Taken together with at least some direct evidence of discrimination, including age-based comments by Kannel, Maybin raises issues of fact with respect to Hilton's proffered non-discriminatory reasons for his termination.

First, Hilton argues that the *average* number of tours allotted to Maybin did not, in fact, decrease during the post-February 2016 time period corresponding with the decrease in his sales numbers. *See* Montenegro Decl. ¶¶ 7–8 (showing average of 30.75 tours from October 2015–January 2016, compared to 31.66 tours from February–July 2016). The comparative monthly *averages*, however, do not tell the whole story. For example, around the time that Wilson became his sales manager in March 2016, Maybin received the following tour assignments: February (37 tours); March (40 tours); April (37 tours); May (19 tours); June (29 tours); July (23 tours). Montenegro Decl. ¶ 8. Although the *average* number of tours from February to July 2016 remained stable as compared to the pre-February 2016 time period, the unexplained drop in the raw number of tours in May 2016 corresponds to the same timeframe in which Maybin received his first written warning in June 2016 for failure to meet performance standards. *See* Kannel Decl. ¶ 13 ("[W]hen Plaintiff did not meet his required VPG in May of 2016, he was issued his first written job performance warning."). There is no additional explanation for the decrease in Maybin's tours during this time period, nor does the Court have a fuller picture of whether other sales agents experienced similar tour decreases during the relevant time. Viewing the evidence in the light most favorable to Maybin, there is at least a question of fact as to the reason for this raw number decrease in tours.

Second, Maybin claims that the decrease is due to age-based discrimination by his supervisors, including his sales manager, Wilson, who deliberately interfered with his ability to close sales. According to Maybin, Wilson treated him in a hostile manner, spoke sarcastically to him at meetings, and hindered his sales by making sarcastic remarks about his clients. Maybin Decl. ¶ 15. Further still, Wilson refused to meet with Maybin's customers after their tours to speak with them about purchasing a timeshare unit, and according to Maybin, "[t]his meant [he] lost sales. Only the sales managers could do the actual sales. This happened about ten times." Maybin Decl. ¶ 15. Hilton did not respond to these assertions in its briefing. Although it is a close call, the cumulative circumstantial and direct evidence is sufficient, for purposes of this Motion only, to raise questions of fact regarding whether age-based discrimination was the but for cause of Maybin's termination. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093 (9th Cir. 2008) ("Although this is a close case . . . [s]uch uncertainty at the summary judgment stage must be resolved in favor of the plaintiff.") (citation and quotation marks omitted); *see also EEOC v. Boeing Co.*, 577 F.3d 1044, 1047–51 (9th Cir. 2009) (reversing grant of summary judgment in favor of employer where plaintiffs were terminated after they received low scores on reduction-in-force assessments, but demonstrated sufficient evidence of pretext that supervisors' performance evaluations were not worthy of credence and therefore pretextual, including evidence that employee was "set up to fail");

*Jackson v. City of Las Vegas*, 2016 WL 5110251, at *3–4 (D. Nev. Sept. 20, 2016)

(denying summary judgment where plaintiff argued that proffered reasons for his

termination were pretextual because he was "set up to fail from the beginning and

was a scapegoat because he is African–American").

Similarly, in *Parris v. Wyndham Vacations Resorts, Inc.*, 979 F. Supp. 2d

1069 (D. Haw. 2013), the plaintiff timeshare sales agent brought disparate treatment

and hostile work environment claims under the ADEA.  The district court denied

summary judgment, finding a question of fact as to whether age-based

discrimination was the "but for" cause of plaintiff's demotion where his supervisor

"made numerous comments to several employees, including [plaintiff], regarding

their age," which the district court found were "probative as to [the supervisor's]

motive for demoting Parris, even if some of them were made to employees other

than [plaintiff]."  *Id.* at 1077.  The *Parris* court explained that "if [the supervisor]

uttered the alleged words, they reveal a belief that older employees are inferior to

younger ones by mere dint of their age. . . .  Thus, [the supervisor]'s alleged

statements, purportedly made frequently and to at least four employees, would, if

proven, be sufficient for a fact-finder to reasonably conclude that [the supervisor]

had an age-based animus.  Whether the alleged animus was the 'but for' cause of

Parris's demotion is a question this court leaves for trial."  *Id.*  Further, the district

court acknowledged that "[w]hile Parris admits that he did not meet the APG[3] required while he was on specific performance, . . . Parris also points to his medium-term and long-term past performance as evidence of his job competence, suggesting that incompetence may not have caused his demotion." *Id*. at 1077–78 (citing *EEOC v. Boeing Co*., 577 F.3d 1044, 1050 (9th Cir. 2009) (finding evidence of longer-term past performance to be probative, despite acknowledged recent poor performance). Viewing the evidence in the light most favorable to Parris, the district court concluded that "the evidence of differential standards, combined with [his supervisor's] allegedly discriminatory statements, create a question of fact as to whether age-based animus was the 'but for' cause of Parris's demotion." *Id.* at 1078.

Likewise, the Court finds on the current record, before the benefit of full discovery in this matter, that all of the above facts, taken together, raise triable issues that Maybin's job performance and resulting termination occurred under circumstances giving rise to an inference of age discrimination. That is, Maybin raises genuine issues of material fact regarding the underlying reasons for his

---

[3]"Sales representatives and managers at Wyndham are assessed on their 'Average Volume Per Guest,' or APG. APG is derived by dividing an agent's net sales revenue by the number of sales 'tours' assigned to the agent in a given period. Having an APG below a certain level can cause an employee to be placed on 'specific performance,' which is a probationary period during which an employee is supposed to increase his or her APG or face possible demotion or termination." *Parris,* 979 F. Supp. 2d at 1071 (citations omitted).

unsatisfactory job performance and Hilton's related reasons for terminating his employment—to which Hilton has yet to fully respond.

**B.    Same Actor Inference**

To the extent Hilton invokes the "same actor inference" in order to demonstrate an absence of pretext, questions of fact nevertheless remain.   When "the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action."   *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005) (quoting *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267 (9th Cir. 1996)).   Yet, whether the same actors were responsible for Maybin's hiring and the events leading to his termination is not beyond dispute on this factual record.

Hilton argues that Kannel is "the same manager who allegedly discriminated against Plaintiff by firing him, [and also] interviewed Plaintiff and approved his hiring in the first instance."   Mem. in Supp. at 16, Dkt. No. 20-1.   Maybin contends that he interviewed with several Hilton managers before he was hired, including Montenegro, notwithstanding Kannel's assertion that it was his recommendation that led to Maybin's hiring.   Moreover, Kannel did not have the independent authority to hire or fire Maybin—he could only recommend as much—because that power resided solely with Montenegro and Boulanger in Hilton HR.   *See Parris*,

979 F. Supp. 2d at 1080 (finding genuine issue of material fact as to whether the same actor was responsible for employee's promotion and demotion, precluding summary judgment on issue of whether same actor inference applied, explaining that "[b]ecause Barker's discriminatory animus is the gravamen of Parris's claim, for Wyndham to be entitled to the 'same actor' inference, Barker must have been responsible for Parris's promotion"); *see also Russell v. Mountain Park Health Ctr. Properties, LLC*, 403 Fed. Appx. 195, 196 (9th Cir. 2010) (a defendant must demonstrate that "the individuals responsible for . . . termination were actually responsible for his hiring, rather than simply participants in that process, [to be] entitled for purposes of summary judgment to the 'same-actor' inference of non-discrimination.").   Further, as previously noted, other supervisors with purported control over Plaintiff's employment conditions also played a role in his sub-par performance and resultant termination.   And neither Kannel nor Wilson refuted Maybin's recounting of their age-based commentary or hostility directed at himself and other older sales agents.

Drawing all reasonable inferences in Maybin's favor, the Court cannot determine that the same actor inference applies and therefore leaves that matter for trial.   If Hilton subsequently demonstrates that the same actor was responsible for both Maybin's hiring and termination, Maybin may only prevail if he makes the

"extraordinarily strong showing of discrimination" required to rebut the "same actor" inference.   *Coghlan*, 413 F.3d at 1097.

## C.   Summary

A motion for summary judgment does not require a plaintiff to prove that the employer's reasons are pretextual.   *Joseph v. City of Santa Monica*, 2018 WL 813357, at *3 (C.D. Cal. Feb. 9, 2018).   Rather, he need only "tender a genuine issue of material fact as to pretext in order to avoid summary judgment."   *Id.* (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).   To do so, he must "produce 'specific facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative as to any [material] fact claimed to be disputed.'"   *Id.* (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)) (some citations and quotations omitted).   Maybin has met that burden here.

Considered cumulatively with the unrefuted direct evidence of Kannel's statements evincing age-based animus and Wilson's deliberate efforts to hinder his sales, Maybin raises genuine issues of material fact as to whether Hilton's proffered reasons for the adverse employment actions taken against him were pretext for and the result of age discrimination.   Viewing the facts and drawing reasonable inferences in the light most favorable to Maybin, the Court finds that genuine issues of material fact remain with respect to pretext on the ADEA discrimination claim at this time.

# CONCLUSION

For the foregoing reasons, the Court denies Defendant's' Motion for

Summary Judgment as to Count I.   Dkt. No. 20.

IT IS SO ORDERED.

DATED: March 6, 2018 at Honolulu, Hawai'i.

_____
Derrick K. Watson
United States District Judge

---

*Maybin v. Hilton Grand Vacations Company, LLC*, CV NO. 17-00489 DKW-KSC; **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**